UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MJB, III,
  *by his mother, Rosie Aldridge,*

    Plaintiff,

    v.                      Case No. 20-CV-703-SCD

COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

    Defendant.

## DECISION AND ORDER

    The mother of minor child MJB, Rosie Aldridge, applied for social security benefits on her son's behalf shortly after MJB turned two years old. She alleged that MJB was disabled based on a combination of developmental and physical impairments. Following a hearing, an administrative law judge denied benefits, finding that MJB's impairments were severe but not disabling. MJB, via Aldridge, now seeks judicial review of that decision. Because substantial evidence supports the ALJ's decision and MJB has failed to demonstrate that the ALJ committed an error of law in reaching his decision, I will affirm the denial of disability benefits.

## BACKGROUND

    MJB was born on May 31, 2015. R. 103.[1] When he was one month old, MJB was dropped on his head during a domestic violence incident involving Aldridge and MJB's biological father. *See* R. 454–55. Three months later, MJB and his half-brother Andrew were

---

[1] The transcript is filed on the docket at ECF No. 13-1 to ECF No. 13-4.

placed in foster care after another domestic violence incident, this time involving Andrew and Andrew's father. *See* R. 219, 455. MJB and Andrew remained in foster care for just over a year before they were returned to live with Aldridge. *See* R. 445–46. MJB has rarely seen his biological father since then. *See* R. 446.

MJB has suffered from several physical impairments since he was young. He was born was asthma, and he has always struggled with breathing, especially while sleeping. *See* R. 219. In September 2016, MJB spent a night in the hospital due to difficulty breathing. R. 212–18. A sleep study conducted the following month revealed mild to moderate obstructive sleep apnea. R. 221. MJB also has a history of recurrent ear infections, for which he had his tonsils and adenoids removed and had tubes placed in his ears in June 2017. *See* R. 233–37. That same month, MJB was diagnosed with atopic dermatitis (i.e., eczema). R. 231–33.

In September 2017, Aldridge applied for supplemental security income on MJB's behalf, alleging that MJB became disabled on August 23, 2017, when he was just over two years old. *See* R. 11, 103–08. Aldridge listed "speech, asthma, ear problems and . . . severe skin problems" as MJB's disabling conditions. R. 114. MJB's application was denied at the state-agency level by the Wisconsin Disability Determination Bureau. *See* R. 45–70.

Pat Chan, MD, evaluated MJB's impairments for the state agency during its initial review. Dr. Chan determined that MJB's impairments did not meet, medically equal, or functionally equal a presumptively disabling impairment. *See* R. 51–52. Specifically, Dr. Chan believed that MJB had a "marked" limitation in acquiring and using information; no limitation in attending and completing tasks; a "less than marked" limitation in interacting and relating with others; no limitation in moving about and manipulating objects; no

2

limitation in caring for himself; and a "less than marked" limitation in health and physical well-being. R. 51–52.

William Fowler, MD, evaluated MJB's impairments for the state agency upon MJB's request for reconsideration. Like Dr. Chan, Dr. Fowler determined that that MJB's impairments did not meet, medically equal, or functionally equal a presumptively disabling impairment. *See* R. 61–63. Dr. Fowler's domain ratings were the same as Dr. Chan's save for one: Dr. Fowler believed that MJB had only a "less than marked" limitation in acquiring and using information. R. 62–63. After MJB's application was denied at the state-agency level, Aldridge requested an administrative hearing before an ALJ. *See* R. 11, 26.

In the meantime, MJB was referred for a psychological evaluation due to behavioral concerns expressed by Aldridge. *See* R. 419–22. Over the course of two days in February 2019, MJB was evaluated by Courtney Meindl, LPC, a licensed professional counselor for children. *See* R. 445–49. Aldridge reported to Meindl that MJB engaged in aggressive behavior, typically aimed at adults when he did not get his way, including hitting, kicking, biting, and screaming; was easily upset; cried for no reason; was uncooperative and defiant at times; and had significant difficulty sleeping. R. 445. At the time, MJB was attending a half-day K3 program, and his teachers noted concerns with verbal and physical aggression. R. 446. MJB was irritable and dysregulated during the evaluations. R. 446. Meindl observed that MJB became upset frequently, with visible tears and shouting. R. 446.

In her final report, dated March 15, 2019, Meindl indicated that MJB presented with speech delay, potential additional developmental delays, behaviors suggestive of traumatic stress, and uncooperative/defiant behavior. R. 448. She recommended speech therapy, occupational therapy, an individualized education plan, and parent-child interaction therapy.

3

R. 448–49. The report also included the findings of questionnaires completed by Aldridge and MJB's teacher. While Aldridge noted several behaviors and symptoms in the "clinical" range, MJB's teacher thought his behaviors were all "normal." *See* R. 447–48.

Around that same time, MJB also was evaluated by Michelle Snyderman, MD, a specialist in pediatrics. *See* R. 453–57. Aldridge reported that MJB was quick to hit, resorted to crying when he didn't get his way, and refused to use the toilet. R. 453. She also reported that MJB ate paper, had difficulty adjusting to school, scratched his eczema until it bled, and had frequent temper tantrums, especially when out in public. R. 453–54. Aldridge recognized that past trauma, including exposure to domestic violence and placement in foster care, had an effect on MJB. R. 453.

Dr. Snyderman observed that MJB's speech was sometimes difficult to understand, that MJB was "very responsive to positive feedback," and that MJB "played very nicely and at length with magnetic blocks." R. 455–56. She noted, however, that MJB exhibited more dysregulated behaviors, including whining, kicking, and resisting, as the visit progressed. R. 456. Dr. Snyderman's clinical impression was emotional dysregulation and temper tantrums, speech and language deficits, and mild fine and gross motor delays. R. 456. She recommended that MJB continue with Head Start (a free developmental program for preschool-aged children from low-income families), resume speech therapy (MJB had been in speech therapy when he was two years old), and begin occupational therapy and physical therapy. R. 457.

MJB and Aldridge appeared in person before ALJ Arman Rouf on July 3, 2019. *See* R. 21–44. After the ALJ explained the right to representation, Aldridge indicated that she wanted to proceed without a representative, and she signed a written waiver of representation.

4

R. 23–25; 99. MJB testified briefly. *See* R. 31–33. He knew his first name and age but had to ask his mom what his last name was. R. 31. When asked what he liked to do for fun MJB responded, "Watch TV." R. 32.

Aldridge also testified at the hearing. *See* R. 33–42. She indicated that MJB was verbally and physically aggressive at school and at home. For example, while attending preschool in Kenosha, he hit his teachers and classmates, ran out of the classroom, stole from other kids, lied, and called his teacher a "bitch." R. 33–36. Aldridge explained that MJB didn't complete the schoolyear due to transportation issues and because the family relocated to Milwaukee. Aldridge stated that MJB engaged in similar behaviors at home, including hitting his mother and his siblings, throwing things, running off and having tantrums when in public, refusing to use the toilet, calling his mom "Fat bitches," and screaming and crying when he doesn't get his way. R. 33–34, 37. Aldridge indicated that MJB had started occupational therapy earlier that year, but he hadn't been to therapy for a couple of months because his family was in the process of moving again and because of ongoing transportation issues. R. 37–38.

As for MJB's physical impairments, Aldridge explained that MJB was on "a lot of medications" for his skin and his ears, had tubes re-placed in his ears in September 2018, and continued to have issues breathing, especially at night. R. 38–40. She estimated that MJB used his rescue inhaler three or four times a week. *Id.* Aldridge indicated that most of MJB's treatment was at Children's Hospital and that he had last seen his pediatrician, "Dr. Joy," a few months ago. R. 39–41.

Applying the standard three-step process for child disability claims, *see* 20 C.F.R. § 416.924(a), on January 14, 2020, the ALJ issued a written decision concluding that MJB

5

was not disabled. *See* R. 8–20. The ALJ determined at step one that MJB had not engaged in substantial gainful activity since September 11, 2017, the date Aldridge applied for supplemental security income on MJB's behalf. R. 12. At step two, the ALJ found that MJB had severe impairments of speech/language delay, emotional dysregulation, and asthma; MJB's other impairments, according to the ALJ, were nonsevere. *Id.* The ALJ determined at step three that MJB's impairments, alone or in combination, did not meet, medically equal, or functionally equal any of the presumptively disabling impairments found in the listings, 20 C.F.R. pt. 404, subpt. P, app. 1. R. 12–16. The ALJ found that MJB had a "marked" limitation in his ability to care for himself and a "less than marked" limitation in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and health and physical well-being. R. 13–14. Based on those findings, the ALJ concluded that MJB was not disabled. R. 16.

Thereafter, the Appeals Council denied review, *see* R. 1–5, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). Aldridge, on MJB's behalf, then filed this action in the district court without the assistance of counsel on May 7, 2020. ECF No. 1. The matter was randomly assigned to me, and all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 5, 6. The matter is fully briefed and ready for disposition. *See* ECF Nos. 16, 17.

**APPLICABLE LEGAL STANDARDS**

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have

6

the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

Substantial evidence supports the ALJ's decision. At step one, the ALJ had to determine whether MJB was working and, if so, whether that work rose to the level of substantial gainful activity. *See* § 416.924(a). A child performing substantial gainful activity cannot be found disabled "regardless of [his] medical condition or age, education, or work experience." 20 C.F.R. § 416.924(b). Not surprisingly, the ALJ here determined that MJB, who was two years old at the time of his application and four years old at the time of the ALJ's decision, had not engaged in substantial gainful activity. R. 12. The analysis therefore proceeded to the next step.

At step two, the ALJ had to determine whether MJB had a medically determinable impairment that was "severe." *See* § 416.924(a). An impairment is severe if it causes "more than minimal functional limitations." *See* 20 C.F.R. § 416.924(c). A child who does not have a severe impairment cannot be found disabled. *See id.* The ALJ here determined that MJB had

8

three severe impairments: speech/language delay, emotional dysregulation, and asthma. R. 12. The ALJ also discussed MJB's history of recurrent ear infections and atopic dermatitis, finding that those impairments did not cause more than minimal limitations on MJB's functioning. *Id.* That finding is supported by the record, as both impairments responded well to medical interventions. *See* R. 230, 232–33, 235–36, 240, 434, 464–65. Moreover, the ALJ found that MJB's sleep apnea did not constitute a medically determinable impairment because it had resolved. R. 12. A sleep study conducted in October 2016 showed evidence of mild to moderate obstructive sleep apnea. *See* R. 221. However, a more recent study from March 2019 showed only "Primary Snoring with no findings of obstructive sleep apnea." R. 440.

At step three, the final step, the ALJ had to determine whether MJB's impairments met, medically equaled, or functionally equaled the listings. *See* § 416.924(a). In determining whether MJB's impairments functionally equaled a listing, the ALJ had to assess their severity in six domains: "(1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being." *Jelinek v. Astrue*, 662 F.3d 805, 810 n.2 (7th Cir. 2011) (citing 20 C.F.R. § 416.926a(b)(1)). "To functionally equal a listing, the ALJ must find an 'extreme' limitation[2] in one category or a 'marked' limitation[3] in two categories." *Jelinek*, 662 F.3d at 810 n.2 (citing 20 C.F.R. § 416.926a(a), (e)(2)(i)). A child who does not have an impairment that meets, medically equals, or functionally equals a listing cannot be found disabled no matter how long the impairment lasts. *See* 20 C.F.R. § 416.924(d).

---

[2] An extreme limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3).

[3] A marked limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2).

The ALJ here determined that MJB's impairments did not meet, medically equal, or functionally equal a listed impairment. R. 12–16. He found that MJB's asthma did not satisfy all the criteria of listing 103.03 and that MJB's speech/language delay and emotional dysregulation did not satisfy all the criteria of listings 112.02 and 112.14, respectively. R. 13. As for the functional-equivalence analysis, the ALJ determined that MJB had a "marked" limitation in his ability to care for himself and a "less than marked" limitation in each of the other five domains. R. 13–14.

In reaching those findings, the ALJ first considered the objective medical evidence. The ALJ noted MJB's overnight hospitalization in 2016 for bronchiolitis and wheezing and acknowledged that MJB's asthma was "under suboptimal control" for the first few years of his life. R. 14 (citing Exhibit 2F/5–6 [R. 216–17], Exhibit 10F/14 [R. 419]). However, the ALJ reasonably concluded that MJB's asthma "significantly improved" after he started using Singulair such that he longer required albuterol regularly as of March 2019. R. 14 (citing Exhibit 10F/2 [R. 407] ("Asthma has been under good control since addition of Singulair – not needing albuterol at all.")).

The ALJ next discussed MJB's alleged speech and language deficits, noting that he was in speech therapy from August 2017 through February 2018, "at which time he was discharged due to having met his goals." R. 14, 283, 321. The ALJ also mentioned a questionnaire completed by MJB's speech therapist in January 2018, wherein the therapist indicated that MJB's speech intelligibility was 70–90% for a familiar listener and 60–70% for an unfamiliar listener. R. 14, 313–15. When MJB was reevaluated the following year, the speech therapist noted that MJB presented with "age-appropriate receptive-expressive language skills and speech sound productions skills." R. 14–15, 491–93.

Next, the ALJ considered MJB's February 2019 evaluations with Dr. Snyderman (the pediatrics specialist) and Meindl (the child counselor). R. 15. The ALJ noted the behavioral concerns Aldridge expressed during those evaluations. R. 15, 445–46, 453–54. Dr. Snyderman indicated that MJB was "very responsive to positive feedback" and "play[ed] nicely with magnetic blocks." R. 15, 455–56. However, she also noted some difficulty with understanding MJB's speech and that MJB exhibited more dysregulated behaviors as the visit progressed. *Id.* During her two evaluations, Meindl observed that MJB became upset easily and had some speech delays. R. 15, 448. Dr. Snyderman and Meindl both recommended speech therapy, occupational therapy, and parent-child therapy. R. 448–49, 457.

After discussing the objective medical evidence, the ALJ described Aldridge's statements concerning MJB's symptoms. *See* R. 14–16. Prior to the evaluations with Dr. Snyderman and Meindl, Aldridge filled out a behavioral checklist in which she indicated that nearly all of MJB's behaviors were in the "clinical" range. *See* R. 15, 451, 454. Likewise, at the administrative hearing, Aldridge testified that MJB continued to demonstrate verbally and physically aggressive behaviors at school and at home, including running away from caregivers, throwing tantrums in public, and stealing from his classmates. R. 15, 33–37. She further alleged that MJB continued to have difficulties with toilet training. *Id.* Aldridge also indicated that MJB had to stop attending both occupational therapy and preschool due to transportation issues and moving several times. R. 15, 36–38.

The ALJ determined that Aldridge's statements were "not fully consistent with the objective medical record." R. 16. The ALJ explained that, while the record did reveal "some emotionally dysregulated behaviors during evaluations," neither Dr. Snyderman nor Meindl recommended "significant mental health interventions." *Id.* The ALJ also noted that there

11

was no evidence of Aldridge engaging in the recommended parent-child therapy and that it appeared that MJB's involvement in these and other potentially beneficial programs had been thwarted by inconsistent transportation and an unstable living situation. *Id.* Moreover, the ALJ indicated that the behavioral checklist completed by Aldridge was inconsistent with the checklist filled out by MJB's teacher, who marked that all of MJB's behaviors were in the "normal" range. *See* R. 15, 451, 454. The ALJ therefore provided sufficient reasons, supported by the record, for why he discredited Aldridge's statements. *See Cullinan v. Berryhill*, 878 F.d 598, 603 (7th Cir. 2017) ("We will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation and support."); *see also* Social Security Ruling 16-3p, 2016 SSR LEXIS 4 (Mar. 16, 2016).

Finally, the ALJ considered the only medical opinions in the record, from reviewing state-agency physicians Dr. Chan and Dr. Fowler. *See* R. 15. During the initial state-agency review, Dr. Chan indicated that MJB had a "marked" limitation in acquiring and using information; no limitation in attending and completing tasks; a "less than marked" limitation in interacting and relating with others; no limitation in moving about and manipulating objects; no limitation in caring for himself; and a "less than marked" limitation in health and physical well-being. R. 15, 51–52. Dr. Fowler largely agreed at the reconsideration level, except he believed that MJB had only a "less than marked" limitation in acquiring and using information. R. 15, 62–63.

The ALJ determined that the opinions of Dr. Chan and Dr. Fowler were "somewhat persuasive." R. 16. The ALJ explained that he did not adopt the state-agency doctors' opinions entirely because "they were formulated prior to the receipt of the majority of the evidence pertaining to [MJB's] emotional dysregulation issues, which appear to be his most

12

limiting impairment at this point." R. 16. Given this more recent evidence, the ALJ found that MJB had a "marked" limitation in his ability to care for himself and a "less than marked" limitation in the other five domains. *See* R. 13–14. The ALJ therefore was more deferential than the opinions of Dr. Chan and Dr. Fowler were to Aldridge's allegations.

In sum, the ALJ's step-three finding is supported by the objective medical evidence, observations from teachers and other caregivers, and the medical opinion evidence.

None of the information Aldridge included in her brief provides a basis for remand. She does not point to any errors the ALJ allegedly made in reaching his decision. Instead, she claims that MJB has undergone another evaluation since his last claim was filed and that the person who conducted the evaluation "felt that he does qualify for the benefits." ECF No. 16. The determination of disability, however, is for the Commissioner alone to make. *See* 20 C.F.R. § 416.920b(c)(3). Aldridge also suggests that she didn't have time to submit all the evidence in support of her son's disability claim and indicates that she will send this evidence to the district court. *See* ECF No. 16. Aldridge, however, never submitted any additional evidence and, even if she had, I likely wouldn't have been able to consider it because wasn't part of the administrative record when the ALJ reached his decision. This court acts largely as a court of appeals and does not generally consider new evidence. Aldridge points to other information post-dating the ALJ's decision, including that she reapplied for benefits on MJB's behalf and was approved in October 2020; that MJB is currently seeing a counselor, psychiatrists, and a therapist; and that MJB continues to have "a hard time daily in class with staying focused and listening." ECF No. 16. Even if true, these facts do not call into question the ALJ's January 2020 decision or entitle MJB to benefits dating back to 2017. Aldridge

therefore has not demonstrated that the ALJ committed reversible error warranting remand; as such, his decision must be affirmed.

## CONCLUSION

For all the foregoing reasons, I find that the ALJ's decision is supported by substantial evidence and that MJB has not demonstrated that the ALJ committed reversible error in finding that he was not disabled. Thus, the Commissioner's decision is **AFFIRMED**. The clerk of court shall enter judgment accordingly.

**SO ORDERED** this 19th day of January, 2021.

_____
STEPHEN C. DRIES
United States Magistrate Judge